Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

**Third Compliance Assessment of Cumberland County Jail (1:23-cv-02655)**

**By: Drs. Homer Venters and Kahlil Johnson**

**Table of Contents**

A.  Introduction                     p.1
B.  Methodology                      p.2
C.  Compliance Assessments           p.4
D.  Summary and Next Steps           p.34
E.  Appendices                       p.35

## A.  Introduction & Summary

This is the third monitoring report in the case of U.S.A. v. Cumberland County, NJ, case No. 1:23-cv-02655 in the United States District Court for the District of New Jersey.

The monitoring of people in withdrawal and the initial physical health assessments by the nurse practitioner have both improved since the last round of monitoring but serious deficiencies remain. Mental health staffing and daily coverage have increased since the last report but the adequacy of care as measured by the consent decree is still below what is required.

This monitoring relates to the settlement agreement reached by the parties, referred to as the "Consent Decree" below. As with the initial two monitoring reports, Cumberland County Jail being is referenced throughout this report as "CCJ" and the United Stated Department of Justice and U.S. Attorney's Office of NJ are referenced throughout as "USDOJ". The focus of the Consent Decree involves the need for monitoring improvements to health services for people in the Cumberland County Jail, including access to treatment for substance use disorder and mental health. No changes have been made to the categories utilized for compliance monitoring which are as follows:

**Substantial Compliance** indicates that the CCJ has complied with all material components of the relevant provision of the Consent Decree and that no significant work remains to accomplish the goal of that provision.

1

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

**Partial Compliance** indicates that the CCJ has complied with some components of the relevant provision of the Consent Decree and that significant work remains to reach substantial compliance.

**Noncompliance** indicates that the CCJ has not complied with most or all of the components of the relevant provision of the Consent Decree and that significant work remains to reach partial compliance."

**Unratable** shall be used to assess compliance of a provision for which the factual circumstances triggering the provision's requirements have not yet arisen to allow for meaningful review through no fault of the CCJ. Provisions assessed as "unratable" shall not be held against the CCJ in determining overall substantial compliance with this Consent Decree in accordance with the termination procedures outlined below.


### B. Methodology and information reviewed.

No changes have been made to the methods utilized for this monitoring report from the initial reports. The monitoring team, and this compliance report, involves the work of Dr. Homer Venters as the lead monitor, and Dr. Kahlil Johnson is the mental health monitor/subject-matter expert assisting with the evaluation of compliance with the mental health provisions of the Consent Decree. Dr. Venters has conducted assessments for areas of the Consent Decree relating to medications for opiate use disorder and other substance use and withdrawal provisions and Dr. Johnson has provided compliance assessments for provisions relating to mental health. Dr. Venters has also assessed one of the areas found within the mental health section (C-38) of the Consent Decree, sick call access. For the purposes of this monitoring, the abbreviation MAT is used for medication assisted treatment is utilized for consistency with the Consent Decree language, although the term Medications for Opiate Use Disorder (MOUD) is also found in standards and other documents relevant to this case and is the term recommended in current clinical guidelines.

The inspection visit for this report was conducted on September 23rd 2024 for Dr. Johnson and September 30th for Dr. Venters. A return visit also occurred for Dr. Johnson on December 9th as this report was being drafted. This report reflects information from both sets of visits. As with prior rounds of monitoring, the monitors were able to conduct interviews with staff as well as detained people without interference. Access to the facility was also unencumbered and adequate.  The monitors also had full access to the facility and split their time between physical inspection of housing areas, clinical spaces and other relevant parts of the facility, interviews with custodial and health staff, and confidential interviews with detained people (selected by the monitors).

The full time HSA left the facility recently and a new HSA has been hired and participated in the most recent remote group meeting in December 2024. There is currently no medical director at CCJ and no regularly assigned physician. One Nurse Practitioner continues to see patients

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

approximately 20 hours per week and nursing staff have the capacity to contact an on-call provider at all other times. CCJ reported plans to expand the existing provider coverage as well as hire a Medical Director. Since the second visit, CCJ has retained the services of a quality assurance expert who has a background in correctional nursing. The purpose of this engagement was presented as providing increased clinical oversight of care for the County.

After the inspection visit, two additional rounds of information were requested from the monitors. Standards of care reflected in this monitoring include the individual, professional experiences of the monitors as well as the guidelines and recommendations of relevant organizations including the National Commission on Correctional Health Care (NCCHC) and the Bureau of Justice Assistance (BJA).

CCJ and their health vendor, CFG Health Systems, LLC (referred subsequently as "CFG"), have provided remote access for both monitors to the electronic medical record (EMR) utilized by CFG. This access has been intermittent between the second and third reports, but is currently restored. Much of the compliance assessment done in this case relies on review of these medical records.

The 'Substantive Provisions' section of the Consent Decree is where the individual areas to be monitored are detailed below. This section has three broad areas of compliance assessment:

- Evidence-Based Protocols for the Assessment of Opiate Withdrawal and Provision of Medication-Assisted Treatment of Opiate Withdrawal
- Medication-Assisted Treatment Training
- Mental Health Care and Suicide Prevention

Each of these broad areas includes more specific elements that are reflected in paragraphs 28-65 of the Consent Decree. Dr. Venters has conducted compliance assessments for the parts of the settlement agreement that bear on MAT and other elements of substance use disorder and withdrawal treatment as well as for sick call, while Dr. Johnson has conducted compliance assessments relating to mental health. These areas are separately reviewed and assessed by Dr. Venters (HV) and Dr. Johnson (KJ).

For areas of assessment that rely on review of medical records, a rate of 90% is utilized to establish substantial compliance. Many areas described in the Consent Decree are not amenable to a chart review alone, and each of the compliance assessments below includes explanation of how compliance was assessed and when needed, how substantial compliance can be achieved.

Charts that were reviewed to assess the mental health provisions were chosen using a search for patient charts with Mental Health Precautions alerts for provisions that were reviewed in this report.  Seventy-one patients initially populated the list.  Six female and six male charts were reviewed for a total of 12 charts using a random number generator.  Five of the 12 charts also had Suicide Precautions alert. The charts utilized in my review are included in Appendix 2.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

### C.  Compliance Assessment

Section A, MAT policies and procedures.

A-28. The broad requirements of this metric are described in the Consent Decree in the following manner: "Consistent with constitutional standards, the CCJ must take reasonable measures to address the heightened risk of self-harm and suicide for incarcerated persons experiencing opiate withdrawal by taking reasonable measures to ensure that incarcerated persons at risk of experiencing opioid withdrawal are identified and assessed and, where clinically indicated, provided adequate opioid withdrawal treatment."

There are four specific sub-elements of this area of compliance, described as follows in the Consent Decree. Each of these areas is assessed individually, in compliance assessments for A-28 a-d.

A-28-a. Intake screening, **Non Compliance** (prior rating non compliance).

*Conduct an intake screening upon admission to the Jail to identify whether any incarcerated person is currently prescribed MAT medications, has a history of an Opioid Use Disorder or other substance abuse disorder, or is experiencing opiate withdrawal.*

Medical records of patients reviewed for this metric were selected by identifying 15 people admitted to CCJ in late 2024. (Appendix 1)  Review of these 15 patient records shows that all 15 (100%) received a timely intake screening in 30 minutes or less. This information is documented in the 'Medical History and Screening' form in each patient's medical records, and a structured variable in the form is review of prior medical records.

The prior reports noted the process of initial health questions being posed at the jail's entry before each person goes through security screening and then is taken to the medical office for their intake screening. This process remains unchanged based on information from the September inspection. All of the patient records I reviewed indicate that the intake screening occurred in a confidential setting, the facility clinic. One area that should be addressed during the initial nursing receiving screening is that patients with asthma do not appear to have their peak flow values checked. This is a basic and expected task for nursing encounters with asthmatic patients and the peak flow at the time of intake, as well as the patient's report of their best peak flow and review of prior values should occur during this initial encounter. People who enter the facility in the midst of intoxication or withdrawal may not report or even be aware of their asthma exacerbation, and objective measurement with the peak flow is an important check. In the current report, 2 patients appear to have asthma documented without a peak flow being obtained at intake. (#12, #15)

One ongoing and serious problem is the lack of timely medical assessment by a physician or mid-level provider as part of the intake process. Provider refers to a physician, nurse practitioner or physician assistant, which reflects the level of health professional qualified to make independent medical assessments and initiate treatment. In the prior report, 11 of 15 cases

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

reviewed (73%) included this deficiency. These cases included patients with very serious health problems that needed to be seen by a provider in their first 24 hours or detention, including patients with potentially complicated withdrawal. In the current review, 8 of the 15 cases (53%) reviewed showed the same deficiency.  These cases included patients with the following concerns that needed immediate or urgent assessment:

- A patient reporting a history of heavy alcohol and other substance use, past strokes and who the screening nurse documented as not being able to fully assess due to excessive movement. Seen by nurse practitioner on day 7. (#2)
- A patient reporting multiple substance use with abnormal vital signs and asthma that was not seen until day 7. (#12)
- A patient with alcohol withdrawal and abnormal vital signs who was not seen until day 3. (#3)
- A patient reporting opiate and alcohol use who was not seen until day 8. (#8)
- A patient reporting a recent stab wound as well as alcohol withdrawal concerns who was not seen until day 5. (#14)

One patient was seen on the day of admission as needed by his clinical presentation. (#4) Although this area remains non compliant, this review brings some evidence of recent improvement. In the prior report, there were multiple patients who were not seen by the provider for weeks. In this review, the range of provider encounters was 1-8 days, with one patient who did not receive an encounter and left on day 7. The prior report's review showed that 6 of the 15 patients did not receive any provider assessment before they left the facility. The mean wait time for provider encounters that did occur was 25 days in the prior report and 4 days in this report. This represents significant improvement but it is still necessary for patients with abnormal vital signs, with serious health problems or with complicated withdrawal to be promptly assessed by a provider either in the facility or at the hospital. Consultation with an on call provider can determine whether these encounters should occur immediately or within the first 24 hours, but they cannot be delayed.

In order to come into substantial compliance with this area, the County should do to following:

- Continue timely intake screening for substance use and potential withdrawal.
- Ensure that nursing encounters with people arriving in the jail include referral for prompt medical assessments with mid-level or physician providers (within 24 hours) for people with serious health problems and potential withdrawal.
- Monitor nursing intake assessments and provide retraining as needed to ensure individual problems reported to nurses are adequately assessed and documented.
- Ensure patients with chronic care problems receive adequate symptom checks at intake, including peak flow for patients with asthma.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

A-28-b. Continuity, **Partial Compliance** (prior assessment partial compliance).

*Ensure that any incarcerated person who had been prescribed a particular medication to treat a substance use disorder or opiate withdrawal continues to receive that medication upon admission to the Jail except where a qualified healthcare professional makes an individualized determination that the treatment is no longer medically appropriate based on the person's current condition.*

In order to assess this area, I reviewed a list of medical records of 15 patients during their time at CCJ. Amont those 15 patients, 8 reported opiate use during their intake assessment and 7 were promptly started on opiate treatment. One patient was assessed as being acutely intoxicated and his start was appropriately delayed until day 2 of detention. As I indicated in my prior report, although the initiation of opiate treatment was timely, several of the patients were facing complicated withdrawal from alcohol and should have been seen by a provider to assess their risk and correct treatment regimen for the combination of MAT and alcohol withdrawal. (#4, #12).

CCJ staff report significant improvements to the issue of receiving medication and treatment records for patients returning to CCJ from Hudson County jail. I also reviewed records from five patients who were transferred from CCJ to Hudson County and received their MAT treatment in that facility. Review of these records indicates that all five patients (100%) experienced adequate access to their MAT while at Hudson County. None of these patients had returned to CCJ at the time of my review. There is still no tracking set up to monitor which patients returning from Hudson County have missing information and aggregate this into reports for both systems to use as a quality assurance tool. This type of tracking is required to ensure that the current improvements in practice are not temporary.

CCJ has continued their important improvement in twice-daily MAT administration. Three of the patients I interviewed during this visit reported that they experience fewer craving or withdrawal symptoms because of this change.

In order to come into substantial compliance with this area, CCJ should do the following:

- Track the Hudson County returns with a running log of patients who came with records, those who did not, and those who experienced missed or delayed care as a result.
- Ensure that patients on MAT are assessed by a nurse practitioner or physician early in their stay, under 24 hours for those with complicated substance use and medical profiles.

A-28-c. Monitoring, **Non Compliance** (prior assessment non compliance).

*Ensure that any incarcerated person who, upon admission to the Jail, has a substance use disorder or may be experiencing opiate withdrawal will be immediately examined (within thirty (30) minutes) by a qualified healthcare professional for an individualized determination, based on evidence-based protocols, such as the Clinical Opiate Withdrawal Scale, as to whether that person should be prescribed medication for the treatment of that substance use disorder or*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

*opiate withdrawal, or placed in holding cell with staggered checks not to exceed 15 minutes augmented by constant video monitoring;*

The same 15 patient records reviewed for the intake assessment above were also reviewed for the timeliness and adequacy of monitoring of patients undergoing withdrawal. Among the 15 patients, 12 showed deficiencies in withdrawal monitoring, resulting in compliance of 20%. (see appendix 1) These deficiencies involved inadequate frequency of monitoring for withdrawal symptoms.  Many of the cited cases involved a person who arrived and was started on treatment for withdrawal but did not receive adequate symptom monitoring. The screenings should occur at intervals consistent with the standard of care outlined in the guidelines referenced below. The most common deficiencies were that monitoring assessments (CIWA or COWS) occurred only once per day, sometimes less often. I have again included the guidelines from the Bureau of Justice Assistance (BJA) include the following information for monitoring of patients in potential withdrawal[1]:

| Substance | Minimum Frequency and Use of Withdrawal Symptom Assessment Scale* |
|---|---|
| Alcohol | Re-assessment using the Clinical Institute Withdrawal Assessment for Alcohol Scale, Revised (CIWA-Ar) *at least* every 8 hours during alcohol withdrawal management until the CIWA-Ar score remains below 10 for 24 hours.<br><br>If the CIWA-Ar is ≥ 19, repeat the CIWA-Ar *at least* every 6 hours during alcohol withdrawal management until the score falls below 19, and then continue monitoring with the CIWA-Ar *at least* every 8 hours until the score remains below 10 for 24 hours. |
| Sedatives | Daily clinical assessment by a qualified health care professional for at least the first week or as condition indicates.<br><br>After the first week, re-assessment by a qualified health care professional at least two times per week until withdrawal management is complete. |
| Opioids | Monitoring using the Clinical Opiate Withdrawal Score (COWS) at least every 4 hours for patients who report use of a short-acting opioid (e.g., heroin, oxycodone, fentanyl).<br><br>Monitoring using the COWS at least every 8 hours for patients who report using long-acting opioids (e.g., extended-release formulations, methadone). |
| Stimulants | Monitoring, at an interval determined by the treating clinician, for suicide risk, cardiac complications, severe or persistent psychosis, significant agitation, and possible opioid withdrawal (due to potential contamination of stimulant drugs). |

As before, most of these patients had one or two CIWA or COWS tools documented in their initial days of detention at CCJ. These withdrawal symptom checks can decrease several days

[1] BJA Guidelines for Medical Management of Withdrawal in Jails, Appendix E. https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

into incarceration, depending on the scores of the initial checks and also the type of substance under consideration. For example, benzodiazepine withdrawal can extend to 5-10 days after the last dose when a patients abruptly stop taking a long-acting benzodiazepine.

Because this is an ongoing area of deficiency, I have again included basic guidance on level of care issues from BJA guidelines:[2]

| Consider transfer to a higher level of care when: |
| --- |
| History of severe or complicated withdrawal is identified. |
| Moderate to severe withdrawal from multiple substances is anticipated. |
| History of severe psychiatric symptoms is identified. |
| A pregnant patient may be at risk for alcohol or opioid withdrawal. |
| **Transfer to a higher level of care when:** |
| Nursing, medical, or psychiatric resources recommended in this guideline are not immediately available. |
| Overdose is suspected. |
| Significant signs and symptoms persist despite multiple doses of medication. |
| Severe signs or symptoms develop during withdrawal management. |
| Existing medical or psychiatric condition worsens. |
| Unstable vital signs do not respond to medications. |
| There is severe or ongoing oversedation. |
| There is moderate to severe withdrawal with significant comorbidity. |
| Alcohol or sedative withdrawal is severe. |
| Complicated symptoms (seizures, delirium, hallucinations) exist. |
| Wernicke encephalopathy is known or suspected. |
| A patient cannot take required medication orally, and there is no capacity to provide medication by another route. |
| Severe psychiatric symptoms are present, and a mental health assessment cannot be immediately provided. |
| Barbiturate or gamma-hydroxybutyric acid (GHB) withdrawal is known or suspected. |
| The treatment plan as recommended by a qualified health care professional cannot be adequately or safely managed in the jail. |
| Acute medical signs or symptoms cannot be safely managed. |

---

[2] BJA Guidelines; From Table G-3, at
https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jails_6-6-23_508.pdf.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

This is one area where the County's partnership with an outside quality improvement team will hopefully yield improvements in tracking and ensuring timely assessments. My experience in other settings is that active monitoring of which patients require these assessments, and communicating with health staff to ensure they are done in a timely manner often requires an additional layer of nursing oversight.

In order to come into compliance with this part of the Consent Decree, CCJ should do the following:

- Ensure consistent withdrawal monitoring, including regular COWS/CIWA checks throughout the day and night, and increased clinical monitoring of patients in isolation cells.
- Create a protocol for nursing or medical managers to review CIWA/COWS tasks at least once per 8-hour shift to review scores and detect missed medications of symptom checks.
- Ensure any patient with a history of alcohol or benzodiazepine withdrawal, or complicated opiate withdrawal has that problem entered into their problem list.
- Include COWS/CIWA compliance as a quality metric, with the % of patients who receive prescribed frequency of checks as the numerator and total number prescribed as the denominator.

A-28-d. Custody Support, **Partial Compliance** (prior assessment partial compliance).

This area of the Consent Decree requires that CCJ do the following:
*Ensure that the Jail staff will support the implementation of clinical decisions regarding the particular medication used to treat a substance use disorder or opiate withdrawal.*

In order to assess this area, I reviewed interview notes with corrections staff and clinical staff, and also relied on inspection notes and observations. CCJ corrections staff continue to express support for MAT efforts and I did not detect any resistance to this area of treatment for CCJ patients including the recent move to twice daily MAT administration. Clinical staff report ongoing problems with production of patients for encounters but the prior recommendation to track patient non-production for lack of security escort has yet to be implemented.

In order to come into full compliance with this area, CCJ should do the following:

- Implement tracking (with the health vendor) to capture a monthly report of all instances where a clinical visit (both scheduled and unscheduled) was delayed, rescheduled or cancelled due to lack of corrections staff.
- Ensure adequate corrections staffing to complete clinician encounters.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

Section B, MAT Training.

B-29. This part of the Consent Decree involves implementation of training for both health and correctional staff. The broad requirement of this area is for CCJ to implement MAT training. The Consent Decree includes that the MAT trainings will be provided annually but is silent on whether each custodial or health staff member should undergo the training annually.

The individual compliance ratings for this area are provided below, with grouping in the assessments when the areas overlap in data and implementation.

In order to assess these four areas of compliance, the following information was reviewed:

- Medical records for patients, selected by the monitor.
- Interview notes from September 2024 inspection and interviews.
- Quality assurance documents from CFG.
- Screenshots of CCJ "Clear" training module slides.
- CFG Training Presentation for CCJ Corrections staff and attendance lists.

B-29-a-c. MAT training for health staff, Substantial **Compliance** (prior assessment partial compliance). The specific language of the Consent Decree in this area includes the following:
*a. The chief medical officer or his or her delegate will train qualified health professional staff and qualified mental health professional staff on substance abuse disorders, opiate withdrawal, withdrawal from other substances, and the use of MAT to treat substance use disorder, opiate withdrawal, and withdrawal from other substances.*
*b. The MAT training will provide training for qualified health professionals on proper medication administration practices, including the provision of MAT, to treat substance use disorders and opiate withdrawal.*
*c. The MAT training will provide training for qualified mental health professionals in providing incarcerated persons with timely referral to a qualified psychologist or psychiatrist, as appropriate.*

The facility health vendor conducted multiple MAT-related trainings for health staff including on 7/22/24 and 1/14/25. I have reviewed the curriculum and sign-in sheets for these trainings and find that they meet the criteria for this area of the settlement agreement.

In order to maintain substantial compliance with this area of the Consent Decree, CCJ and their vendor CFG should do the following:
- Continue regular MAT training for health staff, documenting participation and updating training curriculum with site-specific information.

B-29-d, e. **Partial Compliance** (prior assessment partial compliance). MAT training for corrections staff. The specific language of the Consent Decree in this area includes the following:
*d. The MAT training will provide training for corrections staff on how to recognize whether an incarcerated person is experiencing opiate withdrawal.*
*e. The MAT training will include training to corrections staff, qualified health professionals and qualified mental health professionals on CCJ's MAT policies and procedures.*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

CCJ staff indicated that they have recently conducted corrections staff training, but the contents of that training have not been provided. No training logs have been provided for this training, however facility staff indicated that their plan was for all corrections staff to complete this training. Because no changes have occurred since the last report, this metric remains assessed as partially compliant.

In order to come into substantial compliance with this area, CCJ should do the following:

- Include MAT care and substance withdrawal into the training provided by their clinical staff for their corrections staff.
- Share the full training module with the monitors for review.

B-30. Training Documentation, **Partial Compliance** (prior assessment non-compliance). This area of the Consent Decree includes the following language: *CCJ will document the MAT training of corrections staff, qualified health professionals, and qualified mental health professionals.*

Facility leadership have shared documentation that reflects some corrections staff having completed the recent training on MAT. This is the first documentation of this area during the monitoring activities.

In order to establish substantial compliance with this area of the Consent Decree, CCJ should continue this practice, and specifically, should do the following:

- Maintain a log of custodial and health staff who have received MAT training  (from prior report).
- Request a yearly update on MAT (as part of orientation) completion by health staff (from prior report).
- Request a yearly update on health staff who conduct MAT and withdrawal assessments/care who require remediation or do not meet basic standards of care  (from prior report).

Section C. Mental Health Care and Suicide Prevention

Many of the mental health (MH) sections of the consent agreement were broken down into subsections for clarity and ease of review given their different requirements for compliance. Roughly half of all related sections/subsections will be reviewed in every report.  This report will review the sections/subsections on Suicide Prevention, Morbidity and Mortality Review, Discharge Planning, Confidentiality and Clinical Autonomy, Health Records, and Quality Assurance.

In order to assess these areas of compliance, the following information was reviewed:

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

- Medical records for patients, selected by the monitor.
- Notes from the September and December 2024 site inspections and patient interviews.
- Draft policies shared by CCJ and CFG.
- Quality assurance documents from CFG.

C-38 a-d, Medical or Mental Health Request/Sick Call Process, Non-Compliance (prior assessment Non-compliance).

This area of compliance was assessed by both HV and KJ. The requirement of the Consent Decree is as follows:

*The Jail will ensure that the sick call process provides incarcerated persons with adequate access to medical and mental health care. This process will include:*

a. *Collection: a confidential collection method in which designated staff members collect sick call requests every day to ensure they are triaged.*

b. *Triage: a Registered Nurse, trained in mental health needs, triages the sick call requests based upon the seriousness of the medical or mental health issue as described below in Medical and Mental Health Assessments: Emergent; Urgent; or Routine. The Jail will ensure that medical or mental health requests submitted in the form of a grievance or through another mechanism are appropriately triaged, even if submitted through improper channels.*

c. *Tracking: a logging and tracking system that includes the date the incarcerated person was examined and treated by the Medical Provider (which includes psychiatrists and psychiatric nurse practitioners) if it was clinically appropriate for the incarcerated person to be treated by a Medical Provider. This tracking will be regularly audited to ensure compliance with this process.*

d. *Sick Call Oversight: a sick call oversight system, periodically reviewed by physicians, with nursing protocols and clinical assessment forms that guide the nurses performing sick call through utilization review.*

The sick call process (B-38 a-d) is standard in correctional health. In order to assess this area, we reviewed the following:

- Medical records for patients, selected by the monitors.
- Interview notes from September and December 2024 site inspections.
- Quality assurance documents from CFG.

Interviews with staff during the monitors' third visit continued to reflect that nursing staff do provide sick call encounters on a regular basis. Review of the 15 patients referenced in Appendix 1 showed that 5 received sick call encounters, with three lacking inclusion of the original sick call form in the patient's documents to establish whether the encounter was timely. (# 3, # 12, #13). All five encounters were adequate from a clinical standpoint.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

As of the December 2024 site inspection, CCJ has placed confidential, locked sick call collection boxes on each housing unit.  Nursing staff have the keys to open the sick call boxes when they visit each housing unit for medication pass.  Nursing leadership reported that nurses review the sick call slips while still on the housing unit and then perform face-to-face visits with patients for any urgent or emergent issues. These new processes meet the need for confidentiality in the sick call process.

I also reviewed the quarterly CQI reports and monthly medical audits for CFG, the health vendor at CCJ. Both processes include review of sick call and mental health referral information by custody and health staff, but no physician review/involvement is documented.  An ongoing concern is the charge of $5 for sick call encounters. My own experience is that sick call and other health services charges are extremely counterproductive in detention settings because they serve as a barrier to care and the necessary work to accommodate people who are indigent or appeal their charges create far more work than any revenue. Recent research into this area also suggests that copays and other fees for medical care may create barriers to receiving needed health services.[3] The Consent Decree does not explicitly deal with this issue, and I have not detected any sick call charges for MAT related care (or instances when MAT care was not sought because of a fee concern), but I will report on any such instances that I encounter in review of medical records or interviews with patients and staff.

In order to come into substantial compliance with this area of the Consent Decree, CCJ should do the following:

- Ensure timely triage of sick call slips and face to face encounters for sick call requests.
- Ensure sick call slips and other medical request forms are scanned into the patient's medical records.
- Ensure physician level involvement in review of sick call performance.
- Consider elimination of sick call fees.


C-58. Suicide Prevention, **Partial Compliance**.

*"CCJ shall ensure that suicide prevention measures are in place at the Jail and shall also develop and implement adequate written policies, procedures, and training on suicide prevention and the treatment of incarcerated persons with special needs.*

The jail (CCJ) has suicide prevention measures in place as well as a written policy (policy #B-05) and training on suicide prevention and the treatment of incarcerated persons with special needs.  The CCJ Suicide Prevention policy has been updated.  However, the updated CCJ suicide prevention training has not been provided or reviewed, and the CFG Suicide Prevention policy has not been updated to match the updates in the CCJ policy. Comments on the policy were provided by the monitors and DOJ.  At the time of the last site visit in December 2024, CFG was in the process of updating their policy to correspond with the CCJ policy.

---

[3] https://jamanetwork.com/journals/jamainternalmedicine/article-abstract/2821730.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

CCJ/CFG did not provide an updated copy of their Suicide Prevention training and associated curriculums since the last report.

**In order to come into substantial compliance with this area, the County should do to following:**

- Finish updating the CFG Suicide Prevention policy and update so that it is consistent with the consent decree and national standards.
- Update the CCJ suicide prevention training so that it is consistent with the updated policy and include the associated training curriculum.

C-58.a. Suicide Prevention: Supervision, **Partial Compliance**.

*These procedures shall include provisions for constant direct supervision of actively suicidal incarcerated persons when necessary and close supervision of incarcerated persons with special needs at lower levels of risk (staggered, unpredictable intervals of no more than 15 minutes). Officers shall document their checks.*

The CCJ Suicide Prevention policy continues to include procedures for constant direct supervision of actively suicidal incarcerated persons (Level 1) and for close supervision for the lowers levels of suicide precautions (Levels 2 and 3) at staggered intervals. The policy also indicates that officers will document their safety checks during all levels of suicide watch. Suicide watch logs that were visualized onsite and that were provided by the County demonstrated that the majority of officer patient safety checks occurred every 15 minutes or less at irregular intervals for Level 2 and 3 suicide watch. No documentation has been encountered or reviewed for Level 1 suicide watch during site visits or chart review. Level 1 suicide watch appears to not be used very often in the jail based on discussion with clinical staff onsite, and chart review. This may be due to the requirement for one-to-one observation when a patient is on Level 1. However, during chart review I encountered patients who were on Level 2 have been sent out to the crisis center for further evaluation which suggests that there may be cases when Level 1 suicide watch should have been used but was not.

Review of five charts of inmates who have been on suicide watch continues to reflect that none of them had documented suicide precautions officer check logs scanned into the electronic medical record (EMR).

The cells commonly used for suicide watch are equipped with cameras to visualize patients between officer safety checks. However, many of the cells do not have operational cameras (on the housing units), or have cameras with angles that allow for blind spots in the cell. Examples include transhold and the two cells used for suicide watch in the infirmary. These three cells contain tie off points (e.g., ventilation grates and sprinkler heads) that are in the blind spots and that can be used to tie a noose. This is a safety patient safety risk. This was discussed with leadership during the December 2024 site visit. CCJ Leadership indicated that installment of new cameras has been approved and was supposed to begin in later December 2024. The monitor was told the blind spots can be addressed during installation. CCJ Leadership also

14

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

indicated that they are looking into safe replacement options for the metal grates and sprinkler that can be used as tie off points in the cells mentioned above.

**In order to come into substantial compliance with this area, the County should do to following:**

- Complete installment of new cameras in the cells being used for suicide watch and ensure they cover the current blind spots.
- Remove safety risks (e.g., tie off points) from the cells being used for suicide watch.
- Please scan suicide precautions safety check logs into the EMR when inmates are removed from suicide precautions.  This is a common practice at other correctional institutions.


*C-58.b.*  Suicide Prevention: Policies and Procedures, **Partial Compliance**.

*Suicide prevention policies shall include procedures to ensure the safe housing and supervision of incarcerated persons based on the acuity of their mental health needs.*

This provision is essentially unchanged since the last report.  The suicide prevention policy requires that "All cells or rooms housing suicidal inmates are as suicide-resistant as possible." This area of the policy requires improvement based on the physical layout of the facility.  The cells currently being used for suicide precautions continue to not be "as suicide-resistant as possible."  Some of the cells (transhold and in the infirmary) currently used for suicide watch have poor visibility and sprinkler heads and grate that can be used as a tie-off point for a noose. Finally, the cameras for the cells used for suicide watch on A, B, and D pod are not all functioning and several of the functioning cameras have blind spots. Some of the blind spots persist even with attempts to directly view the patient from the cell door (infirmary cells).  The camera screens remain  more than 10 feet from the officer's desk on the unit, and are not able to be observed regularly due to the officer addressing their other duties on the unit, and due to there only being a single officer on some units.  CCJ leadership said that new cameras were scheduled to be installed in later December 2024.  See the last paragraph of provision 58.a.  There continues to be no preferential placement in one location or another for suicide watch based on the acuity of mental health needs (level of suicide watch).

**In order to come into substantial compliance with this area, the County should do to following:**

- Align the suicide prevention policy with safety cell placement based on the level of suicide precautions.
- To be consistent with the policy, cells used for suicide precautions should be as suicide resistant as possible.  The cells currently in use can be more suicide resistant by removing tie-off points where an inmate can hang themselves (e.g., holes in metal grates over the air vents, sprinkler heads, etc.) and ensuring that there are no blind spots that prevent direct visualization.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

C-58.c. Suicide Prevention: Screening, **Partial Compliance**.

*In accordance with Paragraph 41 above, CCJ shall develop and implement an adequate suicide screening instrument that includes adequate screening for suicide risk factors and protocols that identify any history or behavior that should trigger a mental health assessment.*

The initial section of the "Intake Mental Health Screening and Assessment" EMR form is entitled "Suicide Potential Screening" and 17 questions that adequately assess suicide risk factors. There is a "protocol" at the bottom of the section that says that any questions answered "Yes' in the "shaded area" or if there are eight or more "Yes" answers then the shift manager should be alerted and the patient should be referred for a mental health evaluation. However, there is no shaded area. There are several questions that have a red star next to the question number that correlate with higher risk of suicide that may actually correspond to the "shaded area". The instructions ("protocol") does not indicate the level of referral to MH that should occur. The other questions on the Intake Mental Health Screening and Assessment form identify history and behavior that should trigger a mental health assessment. In the "Disposition" section, the final section of the form, there are options for no MH referral, routine MH referral, "Special housing; mental health referral urgent", and "Suicide Precaution Procedures; mental health referral emergent." The time frames for each referral type are listed below this section as "Routine Referral - within 72 hours", "Urgent Referral - within 24 hours", "Emergent Referral - Immediate (in MH provider not on site, on call provider has to be called)."
However, how the MH clinician should decide which level of referral to choose is not indicated in the instructions (protocol) on the form. Referrals occur by medical staff setting a "Task" in the EMR. Tasks are messages in the EMR that have associated dates and that can be assigned to and/or viewed by designated medical staff who need to address the task. Messages in task typically have the basic information associated with the task (e.g., Brief summary of why the patient was referred to MH) that is needed to complete the task.

**In order to come into substantial compliance with this area, the County should do to following:**

- Clarify the language on the form to correct what should be considered the "shaded areas" on the form.
- Clarify criteria (protocol) for routine, urgent, and emergent MH referrals based on the Intake Mental Health Screening and Assessment EMR form.
- Demonstrate proof of practice that MH referrals are occurring per the MH referral criteria (protocol).

C-58.d.Suicide Prevention: Risk Management, **Non-Compliance**.

*A risk management system shall identify levels of risk for suicide and self-injurious behavior that requires intervention in an adequate and timely manner to prevent or minimize harm to incarcerated persons. The system shall include but not be limited to the following processes:*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

CCJ does not currently have a policy or procedure that meets this provision. To date there is no risk management system in place that identifies levels of risk for suicide and self-injurious behavior. The county has indicated that they plan to implement this provision in the latter half of 2025.

**In order to come into substantial compliance with this area, the County should do to following:**

- Develop a policy/policies for this provision and its subsections and implement it/them per the consent decree.
- Demonstrate proof of practice.

C-58.d.i.1-3. Suicide Prevention: Data Collection I, **Non-Compliance**.

*i. Incident reporting, data collection, and data aggregation to capture sufficient information to formulate reliable risk assessment at the individual and system levels regarding incarcerated persons with mental illness and developmental disabilities.*

1.  *Incidents involving pill hoarding or razor blades and injuries involving pills or razor blades shall be tracked and analyzed by CCJ on a quarterly basis.*
2.  *Incidents involving weapons, self-harm, use of force, suicide, suicide attempts, or assaults between incarcerated persons shall be tracked and analyzed by CCJ on a quarterly basis.*
3.  *All such incidents shall be reviewed, including a psychological reconstruction for suicides, as part of a regularly scheduled suicide prevention committee composed of security, nursing, medical staff, and qualified mental health staff. CCJ shall develop a corrective action plan where appropriate, and the Staffs response shall be clearly documented.*

This provision is unchanged since the last report. CCJ continues to not have a policy or procedure that meets this provision. They do not have a risk management system that collects data consistent with this provision. The county has indicated that they plan to implement this provision between the Q2 and Q4 2025 (2nd to 4th quarter of 2025).

**In order to come into substantial compliance with this area, the County should do to following:**

- See C.58.d.

C-58.d.ii-vi. Suicide Prevention: Data Collection II, **Non-Compliance**.

*ii.    Identification of at-risk incarcerated persons in need of clinical or multidisciplinary review or treatment.*
*iii.    Identification of situations involving at-risk incarcerated persons that require review by a multidisciplinary team and/or systemic review.*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

iv.   *A hierarchy of interventions that corresponds to levels of risk.*
v.    *Mechanisms to notify multidisciplinary teams and the risk management system of the efficacy of interventions.*
vi.   *Development and implementation of interventions that adequately respond appropriately to trends.*

This provision is essentially unchanged since the last report. CCJ does not have a policy or procedure that meets this provision. To date there is no risk management system in place that collects data consistent with this provision. The county has indicated that they plan to implement this provision in the latter half of 2025.

**In order to come into substantial compliance with this area, the County should do to following:**

- See C.58.d.


C-58.e. Suicide Prevention: Timing for Placement, **Non-Compliance**.

*CCJ shall ensure that placement on suicide precautions is made only pursuant to adequate, timely [within four (4) hours of identification, or sooner if clinically indicated], and confidential mental health assessment and is documented, including level of observation, housing location, and conditions of the precautions. In the case of an emergency, CCJ may place an incarcerated person on suicide watch without such prior assessment. In the event that Jail Staff place an incarcerated person on suicide watch in an emergency situation, they shall immediately notify the Shift Commander or Supervisor, who will then notify health services, CCJ shall ensure that such assessment and clinical order is made within four (4) hours of placement on suicide watch.*

The timing for placement and evaluation by MH or notification to MH is not included in the current CCJ Suicide Prevention policy. Suggested edits to meet this provision were included in the mark-up draft CFG Suicide Prevention policy that is still in the process of being updated. During a review of the documentation in the EMR for five patients who were placed on suicide watch, I was unable to verify exactly when the patient was identified as at risk for suicide, when the patient was placed in comparison to when the Suicide Screening form was completed, and when the patient was finally physically placed in a cell on suicide watch. Placement may occur by a correctional officer, and thus documentation from medical or mental health staff regarding the placement is often not documented in the EMR until after placement on suicide watch, sometimes the next day. In order to verify that the requirements of this provision are actually occurring, the county and/or CFG will have to start tracking exact order, placement, and clinical assessment times of the patients placed on suicide watch.

**In order to come into substantial compliance with this area, the County should do to following:**

- Update the Suicide Prevention policy to reflect this provision and then implement the changes in practice.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

- Demonstrate proof of practice including documentation of order, placement, and clinical assessment times.

C-58.f. Suicide Prevention: Timing for QMHP Evaluation, **Partial Compliance**.

*Incarcerated persons requiring a higher level of mental health care will be seen by a qualified mental health care professional within 4 hours of being placed on suicide precautions if during normal business hours, or within 24 hours if outside of normal business hours. The on-call qualified mental health professional must be notified immediately of one's placement on suicide precautions and shall advise with regard to course of treatment, housing, observation, medication, property restriction, and other appropriate care within four (4) hours of placement.*

The timing for placement and evaluation by MH or notification to MH is included in the draft update to the CFG Suicide Prevention policy.  Out of the five charts with a Suicide Precaution alert reviewed for this report, three of the inmates were seen by a QMHP within four hours (or 24 hours if they were placed over the weekend or on a holiday) of placement on watch (60%) during normal business hours.  The QMHPs documented advised on the observation of the patient but did not clearly document when they were notified about the suicide watch placement, course of treatment, housing, medication, and property restrictions.  Property restrictions were commonly included on a paper form that is scanned in to the EMR and that is prepared by nursing staff.  However, in all but one case (20%) the orders for Suicide Watch and documentation supporting when they were placed on suicide watch were missing.

**In order to come into substantial compliance with this area, the County should do to following:**

- Complete the update on the Suicide Prevention policy to reflect this provision.
- Ensure inmates placed on suicide precautions are seen with four hours of placement during normal business hours and within 24 hours of placement outside of normal business hours.
- Ensure order, placement, and provision related QMHP documentation requirements including clinical assessment times are captured when a patient is placed on suicide watch.
- Demonstrate proof of practice including documentation of order, placement, and clinical assessment times.

C-58.g. Suicide Prevention: Step-Down Process, **Partial Compliance**.

*CCJ shall develop and implement an adequate system whereby incarcerated persons, upon evaluation and determination by a qualified mental health professional, may, where clinically appropriate, be released gradually from more restrictive levels of supervision to less restrictive levels for an appropriate period of time prior to their discharge from suicide precautions, Step-down placements should continue to be suicide-resistant and located in such a way as to provide*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

*full visibility to staff, CCJ shall ensure that incarcerated persons are placed on a level of observation that is not unduly restrictive.*

CCJ continues to gradually downgraded patients on suicide precautions, on Levels 1 through Level 3, to less restrictive levels prior to discharge from suicide precautions. Out of the five charts reviewed, all had been gradually downgraded and discharged from Suicide Precaution regardless of what Level they initially were placed on.

Placements continue to be in the safety cells currently in use for suicide precautions. These cells are not as suicide-resistant as possible per the policy given they contain limited visibility including blind spots with tie off points where an inmate can hang themselves. During interviews patients report only being allowed to go to the bathroom, most denied being allowed to take a shower for several days, and are not being given recreation or other out of cell activities (other than court) when they are on suicide watch. This suggests that suicide watch is overly restrictive. Furthermore, only one out of the five charts reviewed (20%) had a Suicide Classification form scanned into the EMR the identified the patient's current Level of suicide watch and the property and privileges that were allowed. The latter is a concrete measure of the level of restriction while on suicide watch.

**In order to come into substantial compliance with this area, the County should do to following:**

- Please ensure the documentation for when patients on suicide watch are downgraded is scanned into the chart to demonstrate compliance with this provision.
- To be consistent with the Suicide Prevention policy, cells used for suicide precautions should be as suicide resistant as possible. The cells currently in use can be more suicide resistant by removing tie-off points where an inmate can hang themselves.

## C-58.h. Suicide Prevention: Conditions, **Partial Compliance**.

*The conditions (jail attire, showers, property, privileges, out-of-cell activities) for incarcerated persons in mental health crisis placed on suicide precautions will be based upon their clinical acuity, whether the specific condition has the potential to hurt or help them, and on how long they have been subjected to suicide precautions.*

The Suicide Prevention policy continues to primarily associate the conditions for inmates on suicide precautions with their Level 1-3. Inmates on Level 1 have the highest clinical acuity with the clinical acuity decreasing as it lowers to Level 3.

Review of five patient charts reflected that only one patient (20%) had a suicide classification form scanned into the chart that indicated their conditions of suicide precautions. Based on the one chart, suicide precaution conditions appeared to be based on clinical acuity which correlated with the level of suicide precautions. Chart review demonstrated that placement on suicide precautions was helpful (measured by the resolution of thoughts to self-harm), and that harm did not occur during placement as far as could be measured by clinician documentation. Other than the decrease in the number of charts including scanned Suicide Classification forms, all other

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

elements of this provision regarding the process and the contents of the form remain unchanged since the last report.

**In order to come into substantial compliance with this area, the County should do the following:**

- Ensure Suicide Classification forms are scanned into the chart.
- Update the Suicide Level Classification form to reflect the requirements of this policy (e.g., clinical rationale for conditions of suicide precautions) and then implement the changes in practice.
- The name and credentials of the staff completing the form need to be clear and legible.
- Consider creating an electronic version of this form within the EMR for ease of use and clear documentation of rationales consistent with this provision.

<u>C-58.h.i.1-4. Suicide Prevention: Jail Attire, **Non-Compliance**.</u>

*Throughout the incarcerated person's time on suicide precautions, a Qualified Mental Health Professional will make and document individualized determinations regarding the incarcerated person's jail attire using the following standards:*

1. *Incarcerated persons on suicide precautions will be permitted their jail attire unless there are clinical contraindications, which must be documented and reviewed every six hours to see if those contraindications remain;*
2. *Removal of an incarcerated person's jail attire (excluding belts and shoelaces) and placement in a safety smock (or similar gown) should be avoided whenever possible and only utilized as a last resort for periods in which the incarcerated person has demonstrated that he or she will use their jail attire in a self-destructive manner;*
3. *If an incarcerated person's jail attire is removed, a Qualified Mental Health Professional will document individual reasons why jail attire is contraindicated to their mental health, and it is presumed that no incarcerated person should be placed in a safety smock for 24 hours or more; and*
4. *48 hours after an incarcerated person's placement on suicide precautions, the psychiatrist, psychologist, or psychiatric advanced practice nurse (APN) will be consulted for approval or disapproval of the return of the incarcerated person's jail attire. If the return of the incarcerated person's jail attire is disapproved, the psychiatrist or psychologist must document in their Mental Health Crisis Treatment Plan individual reasons why jail attire is contraindicated to their mental health.*

See C.58.h. The CFG Suicide Prevention policy is still in the process of being updated and should contain language consistent with this provision when complete. The decision for jail attire is not consistently made by a QMHP. Only one out of five charts reviewed (20%) contained a scanned Suicide Classification form that indicated the conditions of suicide watch. This provision remains non-compliant due to a lack of documentation to support compliance with this provision.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

**In order to come into substantial compliance with this area, the County should do the following:**

- Update the suicide prevention policy, procedures, and forms as needed to match this provision and then implement the changes in practice.
- Provide proof of practice to demonstrate compliance with this provision.

C-58.h.ii. Suicide Prevention: Showers, **Non-compliance**.

*If an incarcerated person has been on suicide precautions for 72 hours and has not been offered a shower, a Qualified Mental Health Professional will document individual reasons why a shower is contraindicated to their mental health. Similarly, if an incarcerated person has been on suicide precautions for longer than 72 hours and has not been offered a shower approximately every two days, a Qualified Mental Health Professional will document individual reasons why a shower is contraindicated to their mental health.*

See C.58.h.  The CFG Suicide Prevention policy is still in the process of being updated and should contain language consistent with this provision when complete.   The processes related to this provision have not changed since the last report.  The Suicide Level Classification form does not include an option to allow a shower for a patient on suicide watch.  Privileges for patients on suicide watch are not included in the MH notes.

**In order to come into substantial compliance with this area, the County should do the following:**

- Update the suicide prevention policy, procedure, and associated forms to match this provision and then implement the changes in practice.
- Provide proof of practice to demonstrate compliance with this provision.

C-58.h.iii. Suicide Prevention: Property, **Non-Compliance**.

*Throughout the incarcerated person's time on suicide precautions, a Qualified Mental Health Professional will make and document individualized determinations regarding the incarcerated person's property, and restrictions should be the least restrictive possible, consistent with safety.*

See C.58.h.  The CFG Suicide Prevention policy is still in the process of being updated and should contain language consistent with this provision when complete.   The processes related to this provision have not changed since the last report. The Suicide Level Classification form contains a section under Level 3 for decisions on property, but this option is not available to those patients on Levels 1 or 2. Decisions on property are being made by both MH and correctional staff.  However, sufficient evidence was not available during chart review to demonstrate that a QMHP is documenting individualized determinations regarding the incarcerated persons property to ensure that restrictions were being kept to the least degree possible to ensure the safety of the patient.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

**In order to come into substantial compliance with this area, the County should do the following:**

- Update the suicide prevention procedure and associated forms to match this provision and then implement the changes in practice.
- Please ensure that QMHPs are documenting individualized determinations regarding the incarcerated persons property to ensure that restrictions were being kept to the least degree possible to ensure the safety of the patient.

C-58.h.iv. Suicide Prevention: Privileges, **Partial Compliance**.

*Throughout the incarcerated person's time on suicide precautions, a Qualified Mental Health Professional will make and document individualized determinations regarding the incarcerated person's privileges (e.g., radio, TV, reading and writing material).*

See C.58.h.  The Suicide Prevention policy contains language consistent with this provision.  The frequency of decision making on privileges for inmates on suicide precautions is indicated in the policy and should occur daily if a privilege is to be restricted.  However, the Suicide Level Classification form contains a section under SPL3 for decisions on privileges.  However, this option is only available to those inmates on SPL3 and is not a choice for those inmates on SPL1 or 2. Decisions are not being made solely by the QMHP.

**In order to come into substantial compliance with this area, the County should do the following:**

- Update the suicide prevention procedure and associated forms to match this provision and then implement the changes in practice.

C-58.h.v.1. Suicide Prevention: Out of Cell Activities, **Non-Compliance**.

*Incarcerated persons on suicide precautions shall be provided out-of-cell time for clinically appropriate structured activities. Throughout the incarcerated person's time on suicide precautions, a psychiatrist, psychologist, or psychiatric APN will make and document individualized determinations regarding the incarcerated person's out-of-cell activities using the following standards:*

*1. Incarcerated persons will be allowed all routine activities, including visitation, telephone calls, and recreation/exercise, If an incarcerated person is not allowed a particular activity*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

*during a day, a psychiatrist, psychologist, or psychiatric APN will document individual reasons why that particular activity is contraindicated to their mental health each day and repeat that same process and documentation each and every day.*

The compliance rating and policy and procedures associated with this provision have not changed since the last report. The Suicide Prevention policy is in the process of being updated but already contained language consistent with this provision. The frequency of decision making on out-of-cell activities for inmates on suicide precautions is indicated in the policy and should occur daily if out-of-cell activities are restricted. There continues to be no indication in the EMR that the psychiatrist, psychologist, or psychiatric nurse practitioner are making decisions about out-of-cell activities for inmates on suicide precautions. During patient interviews the monitor was told that they are allowed to meet with their attorney but not attend other visitations (e.g., friends or family), use the telephone, or to have recreation. Evidence of compliance with this provision was not provided by CCJ.

**In order to come into substantial compliance with this area, the County should do the following:**

- Update the suicide prevention forms to match this provision and then implement the changes in practice.
- Provide proof of practice of compliance with this provision.

C-58.i. Suicide Prevention: MH Crisis Assessment and Treatment, **Non-Compliance**.

*Qualified mental health professional shall assess and evaluate incarcerated persons on suicide precautions on a daily basis and shall provide adequate treatment to such incarcerated persons. Such assessment and treatment shall occur in a confidential setting. If cell-side assessment and/or treatment is required, qualified mental health staff will document, in the incarcerated person's health record, individual reasons why it could not be conducted in a confidential setting. When cell-side assessments are required, health staff take extra precautions to promote private communications. All staff must also maintain privacy when they are present and observe the exchange of protected health information either written or verbally.*

CCJ currently has MH staff onsite on Monday thru Saturday. and these are the days when assessment and evaluation of inmates on suicide precautions occur. CCJ currently does not have MH staff that work on Sundays. Therefore, patients on suicide watch are not evaluated on Sundays which is not in compliance with this provision. Most evaluations (60%) occur in an office setting. However, when MH staff evaluate a patient at the cell door they document it in the EMR but they do not document why the interview needed to occur at the cell door. Additionally, they also typically indicate that the officer was standing nearby while they perform the interview. This is not per the standard of care and does not meet the requirements of this provision.

**In order to come into substantial compliance with this area, the County should do to following:**

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

- Update MH staffing to ensure daily coverage at CCJ by a QMHP to perform follow-up for inmates on suicide precautions in addition to their other duties.
- Evaluations should occur in a private setting and an explanation should be provided if they occur at cell side.
- Officers should stand far enough away to allow privacy during evaluations.
- Provide proof of practice of compliance with this provision.

C-58.i.1.i-viii. Suicide Prevention: Mental Health Crisis Assessment, **Non-compliance**.

*Mental Health Crisis Assessment: Within a working shift or 12 hours after the crisis call/placement in suicide precautions, a Qualified Mental Health Professional shall conduct an mental health crisis assessment and evaluation that will include, but not be limited to, a documented assessment of the following:*

i.   *Incarcerated person's mental status;*
ii.  *Incarcerated person's self-report and reports of others regarding Self-Injurious Behavior;*
iii. *Current suicidal risk, ideation, plans, lethality of plan, recent stressors, family history, factors that contributed to any recent suicidal behavior and mitigating changes, if any, in those factors, goals of behavior;*
iv.  *History of suicidal behavior/ideation - how often, when, method used or contemplated, why, consequences of prior attempts/gestures;*
v.   *Incarcerated person's report of his/her potential/intent for Self-Injurious Behavior; and*
vi.  *Incarcerated person's capacity to seek mental health help if needed and expressed willingness to do so.*
vii. *If the Qualified Mental Health Professional performing the mental health crisis assessment is not a psychiatrist, then during the assessment/evaluation, the Qualified Mental Health Professional will consult with the psychiatrist as clinically indicated.*
viii. *The Mental Health Crisis Assessment/Evaluation will be documented in the incarcerated person's mental health progress note using the Subjective/Objective/ Assessment/Plan (SOAP) or Description/ Assessment/Plan (DAP) format.*

The Suicide Prevention policy is in the process of being updated but already contained language consistent with this provision. One of the five (20%) of the patient charts that were reviewed with a suicide precautions alert demonstrated a MH Evaluation that contained the majority of the elements required from this provision for a MH Crisis Assessment, including completion within 12 hours of placement. The majority of the elements of this provision are not currently being med at CCJ.

**In order to come into substantial compliance with this area, the County should do to following:**

- Update the language of the policy, procedure, and forms to match this provision and then implement the changes in practice.
- Provide proof of practice of compliance with this provision.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

C-58.i.2.i. Suicide Prevention: Daily MH Crisis Assessment, **Non-compliance**.

*Following the mental health crisis assessment/evaluation, a Qualified Mental Health Professional will conduct daily out-of-cell mental health assessments consistent with Paragraph 58.i.1. above for each day that an incarcerated person remains on suicide precautions. Such assessment/evaluation also shall document when and why an incarcerated person requests the assessment cell-side or refuses the assessment, be offered at different times of the day, and document follow-up attempts to meet with an incarcerated person who refuses an out-of-cell daily assessment.*

*i       Each day, the Qualified Mental Health Professional or psychiatric APN must update the suicide precautions conditions (listed above) on a Mental Health Watch form to communicate with Corrections staff and complete a mental health progress note.*

The CFG Suicide Prevention policy is still in the process of being updated and should contain language consistent with this provision when complete.  There is no MH staff coverage, in-person or via telepsychiatry, on Sundays at CCJ.  Therefore, they are not providing daily out of cell assessments for patients on suicide watch because there do not have staff scheduled to do so.  In some of the charts reviewed follow-up with MH staff did not occur for as many as five consecutive days for patients who were on suicide watch.  This poses a significant safety risk to patients, does not meet the standard of care, and does not meet the requirements of this provision.

**In order to come into substantial compliance with this area, the County should do to following:**

- Update the language of the policy, procedure, and forms to match this provision and then implement the changes in practice.
- Ensure daily MH staff coverage at CCJ so that daily assessments of patients on suicide watch can occur.
- Provide proof of practice of compliance with this provision.

C-58.i.3.a-l. Suicide Prevention: Mental Health Crisis Treatment Plans, **Non-Compliance**.

*A Qualified Mental Health Professional will develop a separate individualized crisis treatment plan for incarcerated persons who attempt suicide or engage in self-injurious behavior. A Qualified Mental Health Professional will document the individualized crisis treatment plan in the incarcerated person's health record. This plan shall be updated frequently and when clinically appropriate as interventions are attempted and will address the following:*

*a.      precipitating events that resulted in the reason for the watch;*
*b.      historical, clinical, and situational risk factors;*
*c.      protective factors;*
*d.      the level of watch indicated;*
*e.      any restrictions to jail attire, showers, property, privileges, or out-of-cell activities;*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

*f.     discussion of current risk;*
*g.     measurable objectives of crisis treatment plan;*
*h.      strategies to manage risk;*
*i.      strategies to reduce risk;*
*j.      the frequency of contact;*
*k.     staff interventions; and*
*l.      medications proven to reduce suicide risk.*

The CFG Suicide Prevention policy is still in the process of being updated and should contain language consistent with this provision when complete. None of the charts reviewed contained a Mental Health Crisis Treatment Plan, or a treatment plan consistent with the requirements of this provision. Some of the MH progress notes for patients on suicide watch had language typed into the subjective area of the note that read "CRISIS INTERVENTION PLAN." However, as previously stated, the elements of this provision were not present in any meaningful form.

**In order to come into substantial compliance with this area, the County should do to following:**

- Update the language of the policy, procedure, and forms to match this provision and then implement the changes in practice.
- Provide proof of practice of compliance with this provision.

C-58.j. Suicide Prevention: Discharge Planning, **Non-Compliance**.

*CCJ shall ensure that incarcerated persons are discharged from suicide precautions or crisis level care as early as possible. CCJ shall ensure that all incarcerated persons discharged from suicide precautions or crisis level of care continue to receive timely and adequate follow-up assessment and care, specifically at a minimum of within 24 hours and 7 days following discharge. A qualified mental health professional may schedule additional follow-ups within the first 7 days of discharge if clinically indicated. A qualified mental health professional will develop a treatment plan within 7 days following discharge.*

The CFG Suicide Prevention policy is still in the process of being updated and should contain language consistent with this provision when complete.

Three out of the five patient charts reviewed included patients who had been discharged from suicide watch. Of the three charts, two (67%) were seen within 24 hours of discharge and none (0%) were seen between day one and day seven after discharge. None (0%) of the three charts had treatment plans consistent with post-suicide watch treatment plans.

**In order to come into substantial compliance with this area, the County should do to following:**

- Update the language of the policy, procedure, and forms to match this provision and then implement the changes in practice.
- Provide proof of practice of compliance with this provision.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

C-59. Morbidity and Mortality (M&M) Reviews, **Non-compliance**.

*The Jail will conduct timely and adequate multidisciplinary morbidity-mortality reviews for all deaths of incarcerated persons, including suicides, and all sentinel events and serious suicide attempts (i.e., suicide attempts requiring medical hospital admission). The review shall result in a written interdisciplinary report within thirty (30) days of the incident that shall include a corrective action plan with timetables for completion.*

CCJ does not have a policy that addresses this provision and during the last site visit was in the process of developing a Morbidity and Mortality policy.  CFG has a policy that has not been updated to fully correspond with the consent decree as of the last site visit.  For both CCJ and CFG this also applies to the subsequent M&M related provisions (C-59 through C-61).

There have been two CCJ patient deaths, to the monitors' knowledge, since the second monitoring report.  The first death was on 11.30.2024 and the second was on 12.4.2024.  Morbidity and mortality documentation has not been provided for either death as of the time of this report.

CCJ does not have a M&M Review Committee although their vendor does conduct internal reviews of deaths. CCJ and the monitors discussed the status of morbidity and mortality reviews during a recent meeting.

This rating for this provision remains unchanged.  CCJ has indicated that they will complete the necessary changes to come into compliance with this provision by Q3 (3rd quarter) 2025.

**In order to come into substantial compliance with this area, the County should do to following:**

- Create a CCJ policy to guide Morbidity and Mortality reviews in conjunction with this provision and then implement the changes in practice.
- Update the CFG Morbidity and Mortality policy to meet the requirements of the consent decree.
- We recommend reviewing the following NCCHC guidelines as a reference you create your policy: J-A-09 and MH-A-10, Procedure In The Event of An Inmate Death, consistent with provisions C-59 through C-61.
- Provide proof of practice of compliance for this provision.

C-60.a.i-iv. M&M Review Committee: Membership and Requirements, **Non-compliance**

*The Morbidity and Mortality Review Committee will include one or more members of Jail operations, the medical department, the mental health department, and related clinical disciplines as appropriate. The Morbidity and Mortality Review Committee will:*

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

a.  *ensure the following are completed, consistent with National Commission of Correctional Health Care standards, for all deaths of incarcerated persons and serious suicide attempts:*

i.  *a clinical mortality/morbidity review (an assessment of the clinical care provided and the circumstances leading up to the death or serious suicide attempt) is conducted within 30 days;*

ii.  *an administrative review (an assessment of the correctional and emergency response actions surrounding the death of an incarcerated person or serious suicide attempt) is conducted in conjunction with corrections staff;*

iii.  *a psychological autopsy (a written reconstruction of an individual's life with an emphasis on factors that led up to and may have contributed to the death or serious suicide attempt) is performed on all deaths by suicide or serious suicide attempts within 30 days;*

iv.  *treating staff are informed of pertinent findings of all reviews;*

See provision C-59.

**In order to come into substantial compliance with this area, the County should do to following:**

- Create a policy to guide Morbidity and Mortality reviews that includes the creation of a Morbidity and Mortality Review Committee in conjunction with this provision and then implement the changes in practice.  See provision C-59.

<u>C-60.a.v.a-b. M&M Review Committee: Log, **Non-compliance**.</u>

v.  *a log is maintained that includes:*

a.  *patient name or identification number;*

b.  *age at time of death or serious suicide attempt;*

c.  *date of death or serious suicide attempt;*

d.  *date of clinical mortality review;*

e.  *date of administrative review;*

f.  *cause of death (e.g., hanging, respiratory failure) or type of serious suicide attempt (e.g., hanging, overdose);*

g.  *manner of death, if applicable (e.g., natural, suicide, homicide, accident);*

h.  *date pertinent findings of review(s) shared with staff;*

i.  *date of psychological autopsy, if applicable; and*

See provision C-59.

**In order to come into substantial compliance with this area, the County should do to following:**

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

- See C-59 and C-60.a.i-iv.

C-60.b. M&M Review Committee: Corrective Action, **Non-compliance**.

> b.    *ensure that the Jail takes action to address systemic problems identified during the reviews.*

See provisions C-59 through C-60.a.i-iv.

**In order to come into substantial compliance with this area, the County should do to following:**

- See C-59 and C-60.a.i-iv.

C-61. Access to M&M Reviews, **Non-compliance**.

*CCJ shall ensure that the senior Jail staff have access to all such reviews conducted by the Jail's medical or mental health provider.*

CCJ continues to not have a policy that addresses this provision.  CCJ provided no documentation in support of compliance with this provision prior to this report.

**In order to come into substantial compliance with this area, the County should do to following:**

- See C-59 and C-60.a.i-iv.

C-62.a. MH Discharge Planning, **Non-Compliance**.

*Incarcerated persons with serious mental illness or Opioid Use Disorder shall be provided adequate discharge planning, including a sufficient amount of prescribed medications and appropriate referrals to community mental health services. The Jail shall develop relationships with and solicit input from community mental health organizations and providers regarding incarcerated persons' mental health needs in the Jail and upon discharge from the Jail. Discharge planning shall include services for incarcerated persons in need of further MAT at the time of transfer to another institution or discharge to the community. These services should include the following:*

> a.    *Arranging an appointment with community providers for all incarcerated persons with serious mental illness or Opioid Use Disorder, and ensuring, to the extent possible, that incarcerated persons meet with that community provider prior to or at the time of discharge;*

There have not been any updates to the discharge planning processes that apply to this provision since the last report that addressed this provision.  The county has discussed making the

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

proposed changes recommended by the monitors.  During the December 2024 site visit, CFG indicated that a fulltime Discharge Planner and a Fulltime MAT Coordinator are required to help them meet the requirements of this provision. Documentation of the discharge planning efforts of the CCJ Reentry Coordinator are not being scanned into the EMR.  Regular meetings between CCJ and CFG regarding discharge planning stopped since the last report but both parties have expressed interest in resuming the meetings to better coordinate discharge planning. Documentation of what the CCJ Reentry Coordinator has done that meet the requirements of this provision were not provided.

Medications continue to be provided to patients at the time of discharge although it is unclear how often and how much is provided as no data was provided. Both provision and tracking of this area persists as a crucial gap in the CCJ health service.

**In order to come into substantial compliance with this area, the County should do to following:**

- As an interim stop gap measure for tracking, please have the Reentry Needs Assessment, Reentry Release Plan, and Release Record from scanned into the EMR of patients who are on the MH case load for continuity of care and to meet the full requirements of this provision. This will keep the CFG aware of discharge planning efforts and allow auditing of this provision to ensure compliance.
  - Discharge planning done by the MAT Coordinator should also be scanned into the EMR, or shared with CFG staff during the weekly MAT meeting to be entered into the EMR.
- Provide seven days, or more, of psychotropic medication at the time of release.  This will allow inmates to have medication to take up until they are seen for MH follow-up in the community.
- Arrange for the creation of CFG Discharge Planner and MAT Coordinator positions at CCJ to address the requirements of this, and related provisions.

C-63. Confidentiality and Clinical Autonomy, **Partial Compliance**.

*CCJ shall ensure that discussion of patient information and clinical encounters are conducted with adequate sound privacy in an office-like setting and carried out in a manner designed to encourage subsequent use of health services. All assessments shall be confidential. Because it may be necessary that Custody staff be present during some clinical encounters, CCJ shall ensure that Custody staff receives adequate and documented training on how to maintain patient confidentiality and clinical autonomy. Custody staff shall not interfere with a clinician's assessment or treatment of an incarcerated person; Custody staff shall support the implementation of clinical decisions.*

The psychologist that solely worked on Saturdays now works fulltime at another jail facility.  He is no longer working at CCJ.  However, cell side evaluations continue to occur at CCJ and are documented in the EMR without explanation for why they needed to occur.  Cell side evaluation

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

does not allow for confidentiality and clinical autonomy due to the presence of other inmates, and possibly officers. Telepsychiatry evaluations were witnessed during prior site visits, and they occur in a confidential office setting. The monitors were told by patients, officers, and CFG staff that Psych NP, psychology, and social work MH evaluations occur most often in a confidential office setting, with some still occurring at cell side. The monitor understands that some cell side evaluations will occur due to safety concerns, but the clinical reasoning and the level of confidentiality should be documented in those cases. This is not occurring consistently based on chart review. Therefore, all assessments at CCJ are not confidential as required by this provision. CFG MH Leadership reports that officers are supportive of clinical decision making.

Evidence of CCJ officer training on HIPAA, confidentiality, and clinical autonomy was not provided.

**In order to come into substantial compliance with this area, the County should do to following:**

- Document rationale for cell side evaluations and if they were confidential when they occur.

C-64. Health Records, **Partial Compliance**.

*CCJ shall maintain complete, legible, confidential, and well organized mental health records as part of the medical records at the Jail, separate from the incarcerated person's record.*

　　*a.　Access to individual mental health records of incarcerated persons shall be restricted to medical and mental health personnel, and mental health information shall be shared with jail officers only when the medical or mental health staff believes this is necessary or in the event of investigation of a critical incident.*

　　*b.　Jail Staff shall be instructed not to divulge an incarcerated person's mental health information to other incarcerated persons and shall receive training on how to maintain protect the confidentiality of health information,*

The medical provider, CFG, uses CorEMR as its EMR. CorEMR meets the requirement of this provision for MH care. CFG has indicated that they will transition to a new EMR in the near future but did not share what the new EMR would be. Training for jail staff on HIPAA was not provided prior to the submission of this report so subsection b. of this provision continues to be unverified.

The quality, content, format for delivery, and location of MH documentation in the EMR varies widely and is inconsistent between the psychologist, psychiatric nurse practitioner, and the telepsychiatrist. Documentation of inmate clinical encounters by MH staff are now mainly located found in the Forms, Tasks, and Chart Notes sections of the EMR. Consistent standards for MH clinical documentation should be established and followed by QMHPs at CCJ to ensure clear and consistent documentation of MH care. Organization of the data also varies based on practitioner with some elements of essential clinical information missing from the appropriate sections of the EMR (e.g., psychiatric diagnoses not being placed on the Problem List).

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

**In order to come into substantial compliance with this area, the County should do to following:**

- Provide proof of HIPAA training for all staff working at CCJ.
- Create and implement clear and consistent standards for MH clinical documentation in the EMR.

C-65. Quality Assurance, **Non-Compliance**.

*Cumberland County shall develop and implement, with the technical assistance of the United States and the Monitor, a quality assurance plan to regularly assess and take all necessary measures to ensure compliance with the terms of this Consent Decree. The quality assurance plan shall include, but is not limited to, the following:*

a,    *creation of a multi-disciplinary review committee;*

b.    *periodic review of screening, assessments, use of psychotropic medications, emergency room visits and hospitalizations for incarcerated persons with SMI,*

c.    *periodic review of housing of incarcerated persons with SMI;*

d.    *tracking and trending of data on a quarterly basis;*

e,    *morbidity and mortality reviews with critical analyses of causes or contributing factors, recommendations, and corrective action plans with timelines for completion, identification of parties responsible for completion, and a method to evaluate successful completion; and*

f.    *corrective action plans with timelines for completion to address problems that arise during the implementation of this MOA and prevent those problems from reoccurring,*

Continuous Quality Improvement committee (CQI) forms with minimal data was provided for this report by CFG.  The documentation continues to not include analysis of the findings, tracking and trending of data, is non-specific without measurable goals, and does not include dates or assigned staff for the corrective actions.  The topic areas cross-sect with the areas required in this provision but are not inclusive.  The majority of the requirements of this provision are not being met by the current practices at CCJ.

**In order to come into substantial compliance with this area, the County should do to following:**

- Please update the current CCJ and CFG CQI and MAC meeting data tracking and actions so that they are in coherence with this provision.  This should be clearly reflected in the meeting minutes.  Any associated policies and procedures should also be updated to reflect this provision and any changes that are implemented to come into compliance.

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

### D. Summary and Next Steps

This is the third compliance assessment for CCJ. Monitoring will continue to include compliance on areas A and B of the Substantive Provisions (MAT care & MAT Training) and a subset of area C (Mental Health care and Suicide Prevention).

The administration of MAT continues to improve, but crucial gaps persist in withdrawal monitoring an provider encounters. One area that exhibits improvement is the coordination and information access for patients returning from Hudson County.

Areas of the MH program that require further work to come into substantial compliance with the Consent Decree are numerous and noted above. However, placement of patients at risk for suicide in a safe environment that is as suicide resistant as possible of patients should be an immediate focus for CCJ in the near future.

The provision of MH care per the consent decree for patients sent to Hudson County Jail will be assessed and summarized in the next report; similar to how the provision of MAT at the Hudson County Jail was assessed in this report.

Overall, the current facility leadership and custodial and health staff appear eager to implement new policies and workflows to come into compliance with the Consent Decree. One potential barrier to substantial compliance is the physical plant, and another is staffing. Both of these issues are well known to CCJ and efforts to mitigate them will be central to establishing compliance with the Consent Decree.

The newly engaged County compliance staffer can assist with many of the issues presented in this report and the monitors are eager to coordinate their efforts and perspective with this important role.

This County-based oversight has already helped to streamline information requests and also led to helpful comments for this report. As a result of these discussions, the next monitoring visit will also involve the monitors providing an information request on the day of the visit, so as to clarify and allow for discussion the details of what data is needed for the fourth report. Another suggestion from CCJ was to clarify the timeframe for patient chart review, which will also occur during the monitoring visit.

All parties have also discussed the implementation plan and priorities for policy review & approval. Based on the initial rounds of monitoring, top priorities for policy for the monitors include suicide prevention, discharge planning, use of restraint devices and morbidity/mortality reviews.

The next round of monitoring will occur in March 2025.

Submitted 2/14/25

Homer Venters, MD, MS Lead Monitor

Kahlil Johnson, MD, Mental Health Monitor/Subject Matter Expert

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

**Appendix 1. A-28 a-c. Monitoring**

| Number | Name | Urgent provided assessment needed but not done | Missing COWS or CIWA | Days to NP assessment |
|---|---|---|---|---|
| 1 | | X | X | 7 days |
| 2 | | X | X | 8 days |
| 3 | | X | X | 3 days |
| 4 | | | X | 1 day |
| 5 | | | | 3 days |
| 6 | | | X | 3 days |
| 7 | | | X | Not done (in 7 days) |
| 8 | | X | X | 8 days |
| 9 | | X | X | 2 days (needed immediate) |
| 10 | | | | 4 days |
| 11 | | X | | 2 days |
| 12 | | X | X | 7 days |
| 13 | | | X | 1 days |
| 14 | | X | X | 5 days |
| 15 | | | X | 8 days |

Confidential.Third Cumberland Monitoring (USA v. Cumberland County 1:23-cv-02655)

**Appendix 2. Mental Health Monitoring Chart Review**

| Name | County ID | Alerts |
|---|---|---|
| 1. ███████ | ████ | MHP |
| 2. ████████████ | █████ | MHP, SP |
| 3. ███████ | █████ | MHP |
| 4. █████████ | █████ | MHP, SP |
| 5. █████ | █████ | MHP |
| 6. █████████ | █████ | MHP, SP |
| 7. █████████ | █████ | MHP |
| 8. ██████ | █████ | MHP |
| 9. ██████████ | █████ | MHP |
| 10. █████████ | █████ | MHP |
| 11. ██████ | █████ | MHP, SP |
| 12. ████████ | █████ | MHP, SP |

**Table Key**

- MHP = Mental Health Precautions
- SP = Suicide Precautions